[NOT FOR PUBLICATION]                    [Docket No. 12]

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

LOUIS MAURIELLO,

    Plaintiff,

     Civil No. 09-3360 (RMB)
  v.

MICHAEL J. ASTRUE,    **OPINION**

    Defendant.

Appearances:

  Gabriel J. Hermann
  Insler & Hermann LLP
  One University Plaza Drive
  Suite 8
  Hackensack, NJ 07601
   Attorney for Plaintiff

  Christopher John Brackett
  Social Security Administration
  Office of General Counsel
  26 Federal Plaza
  Room 3904
  New York, NY 10278

  Dennis J. Canning
  Office of the U.S. Attorney
  Social Security Administration
  26 Federal Plaza
  Room 3904
  New York, NY 10278-0004

  Som Ramrup
  Office of the U.S. Attorney
  Social Security Administration
  26 Federal Plaza
  Room 3904

1

New York, NY 10278
        Attorneys for Defendant

**BUMB**, United States District Judge:

## I. INTRODUCTION

Louis Mauriello ("Plaintiff") seeks review of the final decision of the Commissioner of Social Security ("Commissioner") partially approving Plaintiff's application for Social Security Disability ("SSD") benefits under Title II of the Social Security Act ("the Act").  The Court has jurisdiction over the instant matter pursuant to 42 U.S.C. § 1383(c)(3), which incorporates the provisions of 42 U.S.C. § 405(g).  For the reasons set forth herein, the Court will remand this case to determine the onset date of disability.

## II. BACKGROUND

### A. Procedural Background

On October 4, 2006, Plaintiff filed an application for SSD benefits, alleging a disability onset date of January 31, 2005. (Administrative Record ("R.") at 50.)  That claim was denied initially on April 29, 2007 and upon reconsideration on May 2, 2007.  (R. at 50-54.)  On June 29, 2007, Plaintiff filed a written request for a hearing (R. at 55), which was held before Administrative Law Judge ("ALJ") Andrew Weiss on May 14, 2008. (R. at 19.)  On June 23, 2008, the ALJ issued a decision finding that Plaintiff suffered from anxiety and post-traumatic stress

disorder, which became so severe as to cause him to be disabled as of March 15, 2007.  (R. at 13-18.)  On June 12, 2009, the Appeals Council rejected Plaintiff's argument for an earlier onset date, which then became the final decision of the Commissioner.[1]  (R. at 1-3.)  On July 8, 2009, Plaintiff filed the above-captioned action in this Court; he moved for judgment on the pleadings on January 22, 2010.  See Docket No. 12.

**B. Factual Background**

Plaintiff was born on January 12, 1945.  (R. at 22.)  He worked as a research analyst for the United States Customs Department in New York City for eighteen years.  (R. at 22.)  Plaintiff alleges that he became disabled on January 31, 2005, at which time he left work due to psychological conditions stemming from the September 11, 2001 terrorist attacks.[2]  (R. at 23-24; R. at 81.)

After leaving his position, Plaintiff worked approximately sixteen hours a week at different "retail stores" beginning in March 2005.  (R. at 94-95.)  Plaintiff "worked independently and placed price signs for different merchandise in 711's [sic]."  (R. at 106.)  He "had minimal contact with customers."  (Id.)

---

[1]In this case, the Commissioner's decision, as represented by the Appeals Council's decision to deny appeal, upheld the ALJ's opinion.  As such, "ALJ" and "Commissioner" may be used interchangeably here.

[2]Plaintiff's office was on the fifth floor in Six World Trade Center.  (R. at 25.)

Plaintiff stopped working part-time in December 2006. (R. at 95.)

### 1.   Medical Evidence Prior to January 31, 2005

Plaintiff began seeing Dr. Steven Goldberg in 2002 for primary care and coronary artery disease. (R. at 97.) That same year, Plaintiff began seeing Dr. Joph Steckel for prostate cancer treatment and was successfully treated at North Shore University Hospital. (R. at 97-98.)

On February 7, 2004, Plaintiff underwent a stress test, which showed his exercise tolerance to be "excellent" and his heart rate and blood pressure responses to be "normal." (R. at 208.) A few weeks later, on February 25, 2004, Dr. Goldberg referred Plaintiff to Dr. Itzhak Haimovic for a neurological consultation based on Plaintiff's complaints of excessive vertigo and fatigue. (R. at 170.) Dr. Haimovic found Plaintiff to be "[a]lert, attentive, oriented, without receptive or expressive speech difficulties." (R. at 171.) Plaintiff "scored 30/30 on a mini mental exam" and "had no difficulty with recent memory." (Id.) Dr. Haimovic concluded that Plaintiff's "[p]ersistent sensation of dizziness, lightheadedness and imbalance" was most likely caused by agoraphoria and prescribed Plaintiff Paxil. (R. at 171.) Dr. Haimovic also recommended that Plaintiff undergo an electroencephalogram ("EEG"), magnetic resonance imaging ("MRI") and a brainstem auditory evoked potential test to rule out other

potential causes for Plaintiff's condition. (<u>Id.</u>)  None of these tests revealed any abnormalities.  (R. at 166, 168, 172.)

### 2.    Medical Evidence Prior to March 15, 2007

Plaintiff was regularly seen by Dr. Goldberg from 2002 through 2006.  (R. at 230-285.)  In August 2005, Plaintiff complained of fatigue and anxiety, and Dr. Goldberg prescribed Plaintiff Zoloft.  (R. at 252-53.)  Plaintiff underwent a stress test on September 10, 2005, which showed Plaintiff's exercise tolerance and heart rate response to be "excellent."  (R. at 201.)  On September 30, 2005, Plaintiff reported to Dr. Goldberg that he felt "more like myself, less tense, anxiety resolved," and on April 19, 2006, said he felt "better each day." (R. at 240; 248.)  However, on October 2006, Plaintiff again reported feeling anxiety.  (R. at 232.)

On February 26, 2007, Plaintiff sought treatment at South Nassau Communities Hospital ("South Nassau") for anxiety and depression.  (R. at 342.)  In an initial intake evaluation, Plaintiff reported having flashbacks, anger and fear following the September 11 attacks.  (<u>Id.</u>)  He dated these symptoms as beginning three to six months prior to his February 2007 evaluation.  (<u>Id.</u>)  Plaintiff appeared neat, clean, behaved appropriately and was cooperative and friendly.  (R. at 343.) His psychomotor activity was "within normal range," although Plaintiff appeared "anxious" and his affect was considered

5

"angry."  Plaintiff's speech and thought patterns were logical,
relevant, coherent and articulate.  (Id.)  However, his thought
perception evidenced "guilt," and he displayed impaired
concentration.  (Id.)  He was ultimately diagnosed as suffering
from an anxiety disorder, not otherwise specified, and post-
traumatic stress disorder.  (R. at 345.)

### 3.   Medical Evidence After March 15, 2007

Plaintiff saw Dr. Kathleen Acer for a consultative
psychiatric examination on March 21, 2007.  (R. at 288.)
Plaintiff told Dr. Acer that he had been seen by a psychologist
at South Nassau in the previous week and that he had been
prescribed Zoloft and Xanax by his internal medicine doctor.
(Id.)  He told Dr. Acer that he had difficulty falling asleep and
had "daily significant depressed moods and loss of usual
interests."  (R. at 288.)  Plaintiff reported experiencing
"chronic anxiety on a daily basis" and "palpitations, chest
pains, choking sensation, breathing difficulties, and panic
attacks twice per week lasting hours at a time."  (R. at 289.)
These symptoms were "especially triggered by hearing planes and
going into the city."  (Id.)

Dr. Acer reported that Plaintiff was able to drive and use a
computer.  (R. at 290.)  "With regard to his vocational capacity,
[Plantiff] [was] able to follow and understand simple

6

instructions and directions and perform rote tasks."  (Id.)
Plaintiff, however,

> would have trouble maintaining attention and concentration,
> maintaining a regular schedule, learning new tasks,
> performing complex tasks independently, making appropriate
> decisions, adequately relating to others, and dealing with
> stress.

(Id.)  Dr. Acer concluded that Plaintiff suffered from
"psychiatric problems which significantly interfere with his
functioning."  (Id.)  She diagnosed Plaintiff with "[m]ajor
depressive disorder, moderate, [p]anic disorder without
agoraphobia, and [p]osttraumatic stress disorder, chronic."  (R.
at 291.)

Dr. Linell Skeene also saw Plaintiff on March 21, 2007 for a
consultative internal medicine exam.  (R. at 292.)  Dr. Skeene
diagnosed Plaintiff with a herniated disk of the lumbar spine and
concluded that Plaintiff "has mild to moderate limitation for
prolonged standing and heavy lifting due to limited [range of
motion] of the lumbar spine."  (R. at 295.)

On April 26, 2007, Plaintiff underwent a psychiatric review
and mental residual functional capacity assessment with Dr. Y.
Burstein.  (R. at 303.)  The psychiatric review showed that
Plaintiff had a "[d]isturbance of mood, accompanied by a full or
partial manic or depressive syndrome, as evidenced by . . . [a]
medically determinable impairment . . . ."  (R. at 306.)
Plaintiff's functional limitations were considered mild, although

7

he had "moderate" difficulty maintaining concentration.  (R. at 313.)  His "ability to carry out detailed instructions," however, was "[m]arkedly limited."  (R. at 317.)

Nonetheless, Dr. Burstein concluded that Plaintiff's condition did not meet or medically equal any of the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (R. at 319.)  Specifically, he concluded that

> [a]lthough [Plaintiff] d[id] show evidence of symptoms, these complaints [were] not considered to be significantly limiting.  [Plaintiff] [was] capable of understanding and following simple directions and sustaining concentration for simple tasks. [Plaintiff] [was] able to adapt to changes as well as relate adequately to others.  There are not listings met or equaled on [Plaintiff].

(R. at 319.)

Similarly, Plaintiff's physical residual functional capacity assessment, conducted by Dr. A. Goldstein on April 30, 2007, revealed no significant, physical limitation.  Dr. Goldstein noted that Plaintiff's "description of functional limitation [was] vague and [could not] be assessed."  (R. at 324.)  Dr. Goldstein also found that Dr. Skeene's assessment regarding Plaintiff's herniated disk was "vague and [could not] be adopted."  (R. at 325.)

Plaintiff began psychological treatment with Dr. Michael Rosenfeld in October of 2007.  (R. at 334.)  In a letter dated December 31, 2007, attaching an Impairment Questionnaire dated November 12, 2007, Dr. Rosenfeld reported that Plaintiff was

"unable to work now or in the foreseeable future due to the severity and nature of his psychiatric condition."  (R. at 333.) Dr. Rosenfeld opined that Plaintiff met the listing criteria for "both an affective disorder (Listing 12.04) and [a]nxiety disorder (i.e. Listing 12.06)" and that Plaintiff was "totally disabled at the present time and for the foreseeable future." (Id.)  Dr. Rosenfeld's Mental Impairment Questionnaire stated the following regarding onset date:  "Since WTC Incident (9/11/01), there has been a gradual onset and worsening of psychiatric symptoms."  (R. at 341.)

On April 20, 2008, Dr. Rosenfeld authored a second letter in which he noted that, prior to his treatment of Plaintiff, Plaintiff had been referred to a neurologist who "did not find any underlying medical or physical condition" that could explain Plaintiff's dizziness and fatigue.[3]  (R. at 346.)  Based on this information, Dr. Rosenfeld opined that it was his "impression that these 'neurological' complaints [had] a psychogenic component and [were] due to [Plaintiff's] psychiatric condition." (Id.)  Therefore, Dr. Rosenfeld dated Plaintiff's symptoms as dating back to February of 2004.  (Id.)

### 4.   The May 15, 2008 Hearing

_____

[3]Dr. Rosenfeld was apparently referring to Plaintiff's examination with Dr. Haimovic in February 2004.

9

Plaintiff testified at the time of his hearing that although he kept working until age sixty so that he could retire with full benefits, he "got to a point where [he] could not concentrate. [His] output was zero." (R. at 23-25.)  Plaintiff acknowledged that he was able to work for four years after the September 11 attacks but told the ALJ that "he forced himself in." (R. at 24.)

At the hearing, Plaintiff's attorney explained that January 31, 2005 was the alleged onset date because that was the last day that Plaintiff worked. (R. at 26.)  Plaintiff's counsel also suggested, however, that the date Plaintiff started treatment at South Nassau with "Dr. Culkin"[4] might also be an appropriate date. (Id.)  Plantiff's counsel summarized, "the problem here is that I think that [Plaintiff] met the medical definition of disability, through testimony that he could give, probably a year to the date he retired.  The problem is from an evidentiary perspective I think the most sound date would probably be when he started to treat with South Nassau." (R. at 41.)  Counsel could not say, however, the date on which Plaintiff started such treatment. (Id.)  The ALJ noted that he had no treatment records from Dr. Culkin and asked Plaintiff's counsel to prepare a brief

---

[4]There are no treatment records from a Dr. Culkin in the administrative record.

addressing this issue.  (R. at 43-44.)  No other testimony was
taken at the hearing.

### 5.   Plaintiff's Supplemental Brief

On May 27, 2007, Plaintiff's counsel submitted a
supplemental brief to the ALJ containing the following medical
history:

> [Plaintiff] received anti-anxiety medication from his
> family doctor, Steven Goldberg, which as we discussed at the
> hearing is evidenced in his treatment notes. . . . Because
> [Plaintiff's] wife was concerned that [Plaintiff] had a
> brain tumor, Dr. Goldberg referred [Plaintiff] to Dr. Itzhak
> Haimovic, a neurologist.  However, after much testing, Dr.
> Haimovic ruled out an organic disorder.  Therefore,
> [Plaintiff] continued to receive anti-anxiety medication
> from Dr. Goldberg, and did not want therapy.
> The attached records show that [Plaintiff] was treated
> at South Nassau Communities Hospital a month before the
> March 2007 consultative examination ("CE"), which served as
> the proposed OTR onset date.  Furthermore, the attached
> pharmaceutical records confirm that Dr. Steven Goldberg . .
> . was prescribing anxiety medication as far back as 2000.
> Notably, just before Dr. Haimovic prescribed Alprazolam, an
> anti-anxiety drug, in connection with the March 11, 2004
> examination, when he determined [Plaintiff's] problem was
> mental not neurological, Dr. Goldberg had prescribed
> Meclizine on February 11, 2004 and February 25, 204, because
> he thought [Plaintiff's] vertigo-like symptoms were
> neurological in origin.

(R. at 153-154.)

### 6.   The ALJ's Findings

In a partially favorable decision, the ALJ found that
"[s]ince [January 31, 2005,] the alleged onset date of
disability, [Plaintiff] has had the following severe impairments:
post traumatic stress disorder, agoraphobia, depression, heart
problems and a history of prostate cancer."  (Id.)  However, the

11

ALJ found that "[p]rior to March 15, 2007 . . . [Plaintiff] did
not have an impairment or combination of impairments that met or
medically equaled an impairment listed in 20 CFR Part 404,
Subpart P, Appendix 1." (Id.)  The ALJ concluded that "[p]rior
to March 15, 2007, . . . [Plaintiff] had the residual functional
capacity to perform the full range of medium work as defined in
20 CFR 404.1567(c)."  (Id.)

     In reaching this decision, the ALJ concluded that, although
the record evidence supported a finding that Plaintiff's
"medically determinable impairments could reasonably be expected
to produce the alleged symptoms," the Plaintiff's "statements
concerning the intensity, persistence and limiting effects of
these symptoms [were] not credible prior to March 15, 2007, to
the extent they [were] inconsistent with the residual functional
capacity assessment."  (R. at 16.)  The ALJ found that Plaintiff
did not start taking psychotropic medication until 2006 and "did
not pursue any psychological treatment until 2007." (Id.)  The
ALJ noted that Plaintiff "was unable to remember when he began
treatment with a psychologist" at the hearing and acknowledged
granting Plaintiff's counsel "additional time in which to submit
further reports of treatment for his mental impairments."  (Id.)

     However, based on his review of the record evidence, the ALJ
concluded that "[s]ince March 2007, the evidence shows that the
claimant ha[d] depressive symptoms such as anhedonia, poor sleep,

poor energy and poor concentration" and that "[s]ince March 15, 2007, the claimant's anxiety has been so severe as to meet the requirements of Listing 12.06, A. 5. and B. 2 and 3 of Appendix 1." (R. at 17.) Before that date, Plaintiff "retained the residual functional capacity to perform his past relevant work as a U.S. Customs Official" and his "impairments were stable and did not impose any exertional limitations." (Id.)

## II. DISCUSSION

### A. Standard of Review

When reviewing a final decision of the Social Security Commissioner, the Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means, "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Where the ALJ's findings of fact are supported by such evidence, the Court is bound by the Commissioner's findings, "even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)).

Thus, this Court must "review the evidence in its totality, but where it is susceptible of more than one rational interpretation, the Commissioner's conclusion must be upheld." Ahearn v. Comm'r of Soc. Sec., 165 Fed.Appx. 212, 215 (3d Cir. 2006) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986), cert. denied, 482 U.S. 905 (1987)).  The Commissioner, however, "must adequately explain in the record his reason for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F.Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  Said differently,

> [u]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the Court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)); see also Guerrero v. Comm'r of Soc. Sec., Civ. No. 05-1709, 2006 U.S. Dist. LEXIS 71259, at *9 (D.N.J. June 19, 2006)(stating that it is the ALJ's responsibility "to analyze all the evidence and to provide adequate explanations when disregarding portions of it"), aff'd, 249 Fed.Appx. 289 (3d Cir. 2007).

While the ALJ must review and consider pertinent medical evidence, review all non-medical evidence, and "explain [any]

conciliations and rejections," Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000), "[t]here is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence included in the record." Hur v. Barnhart, 94 Fed.Appx. 130, 133 (3d Cir. 2004); see also Fargnoli, 247 F.3d at 42 ("[a]lthough we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Overall, the Court must set aside the Commissioner's decision if the Commissioner did not take the entire record into account or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F.Supp. 277, 284-85 (D.N.J. 1997) (quoting Gober, 574 F.2d at 776).

In addition to the substantial evidence inquiry, this Court must also review whether the administrative determination was made upon application of the correct legal standards. Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983). The Court's review of legal issues is plenary. Sykes, 228 F.3d at 262; Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).

**B.   "Disability" for Purposes of SSI Eligibility**

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v). In Plummer, 186 F.3d at 427-28, the Third Circuit set out the Commissioner's inquiry at each step of this analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful

16

work.  20 C.F.R. § 404.1520(d).  If a claimant does not
suffer from a listed impairment or its equivalent, the
analysis proceeds to steps four and five.  Step four
requires the ALJ to consider whether the claimant retains
the residual functional capacity to perform her past
relevant work.  20 C.F.R. § 404.1520(d).  The claimant bears
the burden of demonstrating an inability to return to her
past relevant work.  Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir. 1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At this
stage, the burden of production shifts to the Commissioner,
who must demonstrate the claimant is capable of performing
other available work in order to deny a claim of disability.
20 C.F.R. § 404.1520(f).  The ALJ must show there are other
jobs existing in significant numbers in the national economy
which the claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.  The ALJ must analyze the
cumulative effect of all the claimant's impairments in
determining whether she is capable of performing work and is
not disabled.  See 20 C.F.R. § 404.1523.  The ALJ will often
seek the assistance of a vocational expert at this fifth
step.  See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.
1984).

This same five-step analysis applies when a Plaintiff makes

a claim based on mental impairments.  See 20 C.F.R. § 404.1520a.

However, the Commissioner applies a "special technique" at each

step of the analysis.  Id.  The Third Circuit summarized this

technique in Morales v. Apfel, 225 F.3d 310, 316 n.7 (3d Cir.

2000):

The regulations dealing specifically with mental
impairments further require the Commissioner to record the
pertinent symptoms and effect of treatment to determine if
an impairment exists.  See 20 C.F.R. § 404.1520a(b)(1)
(1999).  If an impairment is found, the Commissioner must
analyze whether certain medical findings relevant to the
claimant's ability to work are present or absent.  See 20
C.F.R. § 404.1520a(b)(2).  The Commissioner must then rate
the degree of functional loss in certain areas deemed for
work including daily living, social functioning,

17

concentration, persistence or pace, and deterioration in work-like settings. <u>See</u> 20 C.F.R. § 404.1520a(b)(3). If the mental impairment is considered "severe," the Commissioner must determine if it meets a listed mental disorder. If it is severe but does not equal a listed disorder, the Commissioner must conduct a residual functional capacity assessment. <u>See</u> 20 C.F.R. § 404.1520a(c)(3). At each level of administrative adjudication, a Psychiatric Review Treatment Form must be completed. <u>See</u> 20 C.F.R. § 404.1520a(d).

**C. Plaintiff's Appeal**

Plaintiff challenges the ALJ's determination of the onset date of disability, arguing that the ALJ failed to apply Social Security Ruling "SSR" 83-20, 1983 SSR LEXIS 25, at *5-6 (1983). In support of his position, Plaintiff cites <u>Newell v. Comm'r of Soc. Sec.</u>, 347 F.3d 541 (2003), and <u>Beasich v. Comm'r of Soc. Sec.</u>, 66 Fed.Appx. 419 (3d Cir. 2003). Plaintiff avers that "[i]f the ALJ had followed SSR 83-20, then he should have accepted [Plaintiff's alleged onset date] since it was consistent with the evidence." Pl. Br. at 6. Defendant counters that Plaintiff's impairments did not meet or medically equal the 12.04 (affective disorder) and 12.06 (anxiety related disorder) listings until March 2007 and that the medical evidence in the record supports the ALJ's onset date of disability.

**1. SSR 83-20**

In <u>Newell</u>, the Court held that the ALJ failed to follow SSR 83-20, which states the framework for determining the onset of disability date. <u>Newell</u>, 347 F.3d at 548. The "onset of

disability" date is defined by SSR 83-20 as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20, 1983 SSR LEXIS 25, at *2. As recognized by the Court in Newell, determining this date can prove difficult, particularly when, as here, the alleged disability is based on slowly progressive impairments. 347 F.3d at 548.

SSR 83-20 directs, in relevant part, that the following analysis is applied in such cases:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

> Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began . . . .

> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

1983 SSR Lexis 25, at *5-6.

SSR 83-20 also recognizes that precise evidence of an onset date may not always be available:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.
>
> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation.  Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition. . . .

Id.

Newell argued, as Plaintiff here does, that the ALJ failed to follow this SSR 83-20 formula.  347 F.3d at 549.  The Circuit Court agreed, holding that "[t]he ALJ should have consulted a medical advisor to help him infer the onset date as required by SSR 83-20 and our decision in Walton v. Halter, 243 F.3d 703 (3d Cir. 2001)."  Id. (footnote omitted).  In Walton, the Third Circuit held that in a situation where the "impairment was a slowly progressive one and the alleged onset date was far in the past," the ALJ "must call upon the services of a medical advisor

20

rather than rely on his own lay analysis of the evidence." 243
F.3d at 709.  Similarly, in Beasich, the Third Circuit reversed an
ALJ's decision denying disability and held that the ALJ failed to
apply properly SSR 83-20 and consult a medical advisor to infer
the plantiff's disability onset date.  66 Fed.Appx. at 432.
However, Newell, Beasich and Walton are clearly distinguishable
from the case at bar.

## 2.   The Third Circuit's Holdings in Newell, Beasich and Walton

Newell involved a plaintiff applying for widow's disability
benefits who alleged that she became disabled as of July 1, 1997
due to liver disease, diabetes and neuropathy.  347 F.3d at 542.
At the hearing, plaintiff testified that severe pain had prevented
her from working and doing housework since July 1997.  Id. at 544.
The ALJ rejected Newell's testimony, finding instead that the
objective, medical evidence did not support her allegation of
disability.  Id. at 547.  The Third Circuit reversed, noting that
although Newell's records lacked evidence of treatment for liver
disease, diabetes, or neuropathy prior to August 31, 1997, Newell
had explained that she could not afford medical treatment until
June 1998.  Id.  In the absence of contemporaneous medical
records, the Court further held that "[t]he ALJ should have
consulted a medical advisor to help him infer the onset date . . .
."  Id. at 549.

21

In Beasich, the Court held that the ALJ "erred by not
consulting a medical advisor to help him infer an onset date as
required by SSR 83-20 and our decision in Walton v. Halter, [243
F.3d at 703]." 66 Fed.Appx at 433.  The Court noted, however, that
"[s]ome of Beasich's impairments were slowly progressive
impairments, Beasich alleged an onset date that was far in the
past, and there was not a complete medical chronology of his
impairments such that the ALJ could choose an appropriate onset
date without the aid of a medical advisor." Id.  Indeed, the
plaintiff in Beasich applied for benefits on October 8, 1996,
alleging that he had been disabled since July 1, 1981.  Id. at
420.

The facts in Walton were also similar.  There, the plaintiff
sought child's disability insurance benefits based on mental
illness, bipolar disorder-manic depression, alleging that he was
disabled as of June 13, 1966.  243 F.3d at 705.  The Court
recognized that the ALJ lacked the benefit of clear medical
records:

> [Walton] was first diagnosed as having bipolar-manic
> depression in 1971 when he was twenty-six years of age, and
> the contemporaneous medical records from the period after
> that date are extensive.  While the contemporary medical
> records from the preceding period are considerably more
> limited, they do bear evidence that Walton's mental
> impairment originated prior to 1971.  The ALJ was thus
> confronted in 1994 with the difficult task of determining
> whether Walton's progressive mental impairment rose to the
> level of a disability prior to his twenty-second birthday on
> June 13, 1966.

22

Id.

However, Walton did proffer letters from doctors who had treated him in the early nineties and who supported Walton's onset date. Id. at 707. The ALJ rejected these letters, finding instead that "[t]here [wa]s no contemporaneous further record of [Walton] receiving treatment for severe emotional or mental impairment through June 14, 1966." Id. at 708. The Third Circuit reversed, holding that "the ALJ could not, consistent with SSR 83-20 and the necessity of establishing an onset date based on substantial evidence, simply ignore" the retrospective opinions of these doctors. Id. at 709. As noted, the Third Circuit also concluded that SSR 83-20 required the ALJ to "call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence." Id.

Subsequent case law has interpreted Walton and Newell's directive to apply only in cases where the impairment at issue becomes progressively worse over an extended period of time and the ALJ must infer the onset date based on an unclear medical record. See Bailey v. Comm'r of Soc. Sec., 354 Fed.Appx. 613, 618 (3d Cir. 2009) ("As the District Court noted, further decisions of our court have confirmed that Walton's directive to seek out the services of a medical advisor is limited to situations where the underlying disease is progressive and difficult to diagnose, where the alleged onset date is far in the past, and where medical

23

records are sparse or conflicting."); Klangwald v. Comm'r of Social Sec., 269 Fed.Appx. 202, 205 (3d Cir. 2008) ("we have generally applied SSR 83-20 only where medical evidence from the relevant period is unavailable"); Kirk v. Comm'r of Soc. Sec., 177 Fed.Appx. 205, 208-09 (3d Cir. 2006) (finding Walton inapplicable where plaintiff's claim of earlier onset created a time period of only three years and where medical evidence for relevant period supported ALJ's conclusion regarding onset date); Jakubowski v. Comm'r of Soc. Sec., 215 Fed.Appx. 104, 108 (3d Cir. 2007)("By contrast with Newell and Walton, as noted by the District Court, the ALJ in this case had access to adequate medical records from the time period before the expiration of Jakubowski's insured status, and these records did not support her alleged onset date.").

### 3.   The ALJ Has Access to Adequate Medical Records to Infer Onset

Here, there is no question that Plaintiff suffered from slowly progressive impairments.  Nor is there any dispute that these impairments eventually qualified Plaintiff as disabled. Rather, like the facts in Kirk, the Plantiff's claim of an earlier onset date than that found by the ALJ creates a disputed period of a little more than two years.  These facts alone distinguish this case from Newell, Beasich and Walton.  Most important, however, here the ALJ has access to adequate medical records from the time period in question to infer onset.  Therefore, this Court cannot

say that the ALJ erred in failing to consult a medical advisor pursuant to SSR 83-20.

**4.    The Court Will Remand for a Determination of Onset Date**

Nonetheless, the Court finds that some medical evidence appears to conflict with the March 15, 2007 onset date determined by the ALJ.  On remand, the ALJ should clarify certain aspects of the record.

First, the ALJ should clarify his assessment of Plaintiff's credibility.  The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible prior to March 15, 2007, to the extent they are inconsistent with the residual functional capacity assessment." The ALJ further found that Plaintiff did not take psychotropic medicine until 2006 and did not pursue psychological treatment until 2007.

The record reveals, however, that Plaintiff had been proscribed such medication as early as 2004 and reported taking both Paxil and Zoloft in 2005.  Moreover, "the lack of contemporaneous medical evidence of an objective nature is not necessarily determinative as to the onset date, and to the extent the ALJ's decision was based on a legal determination that the onset date of an impairment had to be proved by such medical evidence, it is erroneous."  <u>Kelley v. Barnhart</u>, 138 Fed.Appx.

505, 508 (3d Cir. 2005) (citing <u>Newell</u>, 347 F.3d at 547).
Therefore, if the ALJ believed that contemporaneous, medical
evidence was <u>necessary</u> to corroborate Plaintiff's testimony, the
ALJ was in error.  The Court further observes the inconsistency of
using the residual functional capacity assessments, which found
that Plaintiff suffered no significant impairment in April 2007,
as a basis for rejecting Plaintiff's credibility but in turn
finding that Plaintiff became disabled as of March 15, 2007, a
date prior to these assessments.

On remand, the ALJ should also seek clarification of Dr.
Rosenfeld's onset opinions.  By letter dated April 20, 2008, Dr.
Rosenfeld observed that Plaintiff's neurological complaints of
dizziness and fatigue in February 2004, given the absence of any
underlying medical or physical condition found at that time, were
the result of his psychiatric condition.  To be sure, Dr.
Rosenfeld's April 20, 2008 letter does not state when the severity
of Plaintiff's symptoms met the listings-level criteria.  Rather,
the letter simply relates that Plaintiff's "psychogenic symptoms
had been ongoing and dated back to at least February 2004."

Dr. Rosenfeld's Mental Impairment Questionnaire, completed on
November 12, 2007, is no more enlightening.  It states the
following regarding onset date:  "Since WTC Incident (9/11/01),
there has been a gradual onset and worsening of psychiatric
symptoms."  The ALJ should seek additional evidence or

26

clarification from Dr. Rosenfeld regarding this opinion.  See 20
C.F.R. § 404.1512(e)(1) ("When the evidence we receive from your
treating physician or psychologist or other medical source is
inadequate for us to determine whether you are disabled, we will
need additional information to reach a determination or a
decision. . . .  We will seek additional evidence or clarification
from your medical source when the report from your medical source
contains a conflict or ambiguity that must be resolved, the report
does not contain all the necessary information, or does not appear
to be based on medically acceptable clinical and laboratory
diagnostic techniques.").

    Finally, the Court understands that the March 15, 2007 date
was apparently reached because Plaintiff told Dr. Acer that he
first sought psychological treatment at South Nassau a week prior
to his March 21, 2007 evaluation.  (R. at 288.)  Plaintiff's
counsel, although arguing the January 31, 2005 onset date in his
brief, suggested at the hearing that the appropriate onset date
might be "the date when [Plaintiff] started treatment with Dr.
Culkin at South Nassau."  (R. at 26.)  However, there are no
treatment records from South Nassau in the record.  Rather, the
only document from South Nassau was Plaintiff's Initial Intake
Evaluation conducted on February 26, 2007, which apparently was
provided to the ALJ as an attachment to Plaintiff's supplemental
brief.  Given the need to remand this case for a determination of

onset date, the Court simply notes, as did the ALJ, that the South Nassau treatment records should be added to the record.

**IV. CONCLUSION**

In sum, the Court finds that the ALJ's determination of March 15, 2007 as the onset date appears to conflict with some of the medical evidence. Therefore, this case will be remanded to determine the onset date consistent with this Opinion. An appropriate Order will issue this date.


Dated: <u>May 25, 2010</u>          <u>s/Renée Marie Bumb</u>
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE